In re STUDEBAKER.

(District Court, S. D. New York. March 19, 1903.)

1. BANKRUPTCY—DISCHARGE—DESTRUCTION OF BOOKS AND RECORDS.

Where it was shown that a bankrupt inherited stocks from his father of the value of $150,000, which, according to his testimony, he sold, and the proceeds of which he spent in stock speculations and gambling within three years preceding his bankruptcy, the destruction of his bank checkbook and passbook within a year prior to his bankruptcy, unexplained, justifies an inference that it was with fraudulent intent to conceal his true financial condition, and is sufficient ground for refusing his discharge.

## In Bankruptcy. On application for discharge.

To the Honorable George B. Adams, Judge of the District Court of the United States in said District:

I, the undersigned, referee in bankruptcy, to whom as special commissioner the issues of specifications herein were duly referred, to ascertain and report the facts, respectfully report:

"That the said issues were brought on for hearing, and I was attended upon said hearing by the counsel for the opposing creditor and the counsel for the bankrupt, and that testimony was adduced thereon, the stenographic minutes of which are herewith filed, marked 'Schedule A.' That the specifications were filed on behalf of Max Bleiman, a creditor, and which are substantially as follows:

"First. That the said bankrupt knowingly and fraudulently concealed from his trustee, etc., property belonging to his estate in bankruptcy, to the amount of about $150,000, alleged to have been realized by him from the sale of stock bequeathed him by his father.

"Second. That he knowingly and fraudulently concealed, etc., other property belonging to his said estate in bankruptcy, consisting of his salary of $3,600 per year, paid to his wife, and alleged to have been held by her for said bankrupt.

"Third. That he knowingly and fraudulently made false oath in these proceedings in omitting from his schedules the above-mentioned property.

"Fourth. With fraudulent intent to conceal his true financial condition, and in contemplation of bankruptcy, he destroyed certain records, etc.

"Fifth. That with like intent and in like contemplation he failed to keep books of account, etc.

"Sixth. Knowingly and fraudulently made false oath in omitting from his schedules $5,000 alleged to have been in his possession or under his control. The testimony shows, in substance, that in about 1897 the bankrupt received by bequest from his father, who died October, 1897, 1,000 shares of stock in the Studebaker Carriage Company, besides some real estate; that he disposed of said stock from time to time, and received therefor about $150,000. The bankrupt testified that the whole of the sum received from the sale of the said stock he has spent; that it was lost in gambling—cards, faro, and horses—and that no one holds any of said stock in trust for him (see examination before U. S. commissioner, pp. 3 and 9); that he was never engaged in any trade or business, and never kept any books (page 4); that he ran through the above-mentioned sum of money in a period of about three years; that he had memoranda of the purchase and sales of stock, but he does not know what became of them (page 9); that he is employed now by the Studebaker Manufacturing Company, which has a place of business in this city, at a salary of $300 per month, which employment began about March, 1901; that this salary is paid over to his wife. It seems that the payment is made by checks either payable to her order or payable to his order and indorsed for him by her (see page 12; also stenographer's minutes of testimony before referee, page 2), and that the checks or their proceeds are deposited in her bank account, or applied by her to the payment of family expenses. The bankrupt testifies (testimony before the commissioner, page 14) that about $30,000 of the proceeds of this stock was used in paying debts previously

contracted, and that some of these shares of stock was disposed of by him in Chicago. It also appears that after coming from Chicago he opened an account in the Second National Bank in this city. It appears from the transcript of said account in evidence, and filed herewith, that the account was opened February 23, 1899, and closed October 23, 1901, the total amount of deposits during that interval being $70,032.50, and the account being closed with an overdraft of $1.47.

"The only witnesses produced were the bankrupt and his wife, and their testimony is uncontradicted. There is, therefore no direct evidence that any other disposition was made of the proceeds of the Studebaker stock than to which the bankrupt testified, and the claim that that amount or any considerable part of it is still in the bankrupt's possession seems to rest chiefly upon the improbability that any man could dissipate in the course of three or four years the sum of $150,000 in stock speculation and gambling. No attempt was made to contradict the statement of losses in stock speculation by calling the broker through whom said speculations were had, and, while such improvident and reckless speculation is not, it is hoped, a frequent occurrence, there is nothing impossible, or even improbable, in the story that so large a sum was dissipated in stock speculations, especially when to such speculations is added betting on horse races and gambling at faro. The bankrupt's account in the Second National Bank tends to corroborate his testimony, showing, as it does, that he expended over $70,000 between February 21, 1899, and October 23, 1901, during which period he had no source of income excepting this bequest and his stock speculations and gambling.

"I recall nothing in the testimony before me which would justify a finding of fact that any part of the proceeds of this stock is in the hands of the bankrupt, and concealed from his trustee; and the same remark applies to the sum of $5,000 or less which the bankrupt received as the proceeds of real estate devised to him by his father.

"I am confirmed in this opinion by the statement in the schedules in which of the $9,304.54 total liabilities over $7,600 appears to have been for money borrowed by the bankrupt, and with the exception of $332.40 borrowed by the bankrupt during the year 1902. It is hardly conceivable that a man, if he had concealed $150,000, or anything like that sum, would have borrowed in that year over $7,000 in various sums and from various people, and then sought relief from these comparatively small debts by filing his petition in bankruptcy.

"In regard to the payment of the bankrupt's salary to his wife, the testimony of both the bankrupt and his wife agree that it was paid to her practically directly, and that it was applied, so far as it goes, to the living expenses of the family; and there appears to be no proof that any of this sum is retained or concealed by the bankrupt's wife, or applied for any other purpose than the support of the family, the expenses of which would, as appears from the testimony, be fully equal to, if not in excess of, the amount of such salary. Especially it does not appear that any of the salary received by the bankrupt prior to filing his petition herein remains undisposed of, or retained by anybody for the bankrupt's use. No concealment was made of the fact that the salary was paid to the bankrupt's wife, and, although I do not recall any evidence as to the reason why such payment was made to her rather than to him, the previous actions of the bankrupt, in connection with the large legacy received from his father, would seem to afford a reasonable explanation and justification of the somewhat unusual method of paying the bankrupt's salary to his wife.

"The bankrupt did not, it appears, keep books of account, but, inasmuch as the testimony shows that prior to his present employment he was in no business, and that in his present employment on a salary there seems to be no occasion for keeping a set of mercantile books, I do not think his failure to keep such books can be considered as militating against his discharge.

"So, also, as to the alleged destruction of the books referred to in the fourth specification, while the bankrupt admits that he destroyed some memoranda of stock transactions, I see no evidence from that fact or elsewhere in the testimony before me of any fraudulent intent on his part to conceal his true financial condition by so doing.

"For the foregoing reasons, I am of the opinion that the specifications have not been sustained, and that the bankrupt is entitled to his discharge.

"All of which is respectfully submitted."

Maurice Meyer, for bankrupt.

Lesser Brothers, for creditor.

HOLT, District Judge. This is an application for the bankrupt's discharge. One of the grounds of objection is that the bankrupt, with fraudulent intent to conceal his true financial condition, and in contemplation of bankruptcy, destroyed his bank checkbook, passbook, and vouchers. The evidence shows that the bankrupt inherited from his father, in 1897, property of the value of $150,000. He testified that he sold this property, and in the three years before bankruptcy lost it in stock speculation and gambling. He now has a salary of $3,600 a year, which is paid by arrangement to his wife. He lives on a liberal scale in an apartment for which he pays a rent of $2,000 a year. His scheduled debts amount to about $9,000, about $7,000 of which is for money borrowed within a year before his bankruptcy. He admitted, upon examination, that he had destroyed his bank checkbook and passbook during the year before the adjudication. He gave no explanation for such action. He testified that he never kept any other books. The objecting creditor claimed, and, on the facts, was justified in suspecting, that some of the $150,000 claimed to have been lost in speculating and gambling was concealed; but he was unable to prove it. If the bankrupt had not destroyed his checkbook, the creditor might have had some basis for investigating the truth of his statement.

Under the circumstances, I think that the inference is justified that the bankrupt destroyed his checkbook and bankbook with fraudulent intent to conceal his true financial condition and in contemplation of bankruptcy. The application for his discharge is therefore denied.